**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Health Cost IQ Incorporated,<br><br>       Plaintiff,<br><br>v.<br><br>BDG Benefits Design Group Incorporated,<br><br>       Defendant. | No. CV-25-00070-PHX-DWL<br><br>**ORDER** |

Pending before the Court is a motion for default judgment filed by Plaintiff Health Cost IQ, Inc. ("Plaintiff" or "HCIQ"). (Doc. 11.) The Court requires supplemental briefing regarding Plaintiff's anticipatory breach claim.

**RELEVANT BACKGROUND**

On January 8, 2025, Plaintiff filed the complaint. (Doc. 1.) The complaint alleges that in May 2024, Plaintiff entered into a software-as-a-service license agreement ("the Agreement") with Defendant BDG Benefits Design Group, Inc. d/b/a 1850 Plan Services ("Defendant" or "1850"). (Doc. 1 ¶¶ 1-2.) The Agreement had a "5 Year Initial Term." (*Id.* ¶ 21(a).) Under the Agreement, Plaintiff agreed to provide certain software—which is described as "a comprehensive population health, risk profiling, cost and plan management platform" (hereinafter, "the Software")—and other services to Defendant in exchange for quarterly payments of $73,500. (*Id.* ¶¶ 20-21.) Plaintiff "complied with its obligations under the Agreement" and sent three quarterly invoices for $73,500 to Defendant—the first on July 1, 2024, the second on October 1, 2024, and the third on January 7, 2025—but

1 | Defendant failed to pay any of those invoices.  (*Id.* ¶¶ 40, 45.)

2 | The complaint further alleges that between August 2024 and October 2024, Plaintiff's representatives engaged in various communications with two of Defendant's principals (Ms. Norman and Mr. Smith) concerning the past-due invoices and other matters related to the Agreement.  (*Id.* ¶¶ 25-37.)  During one meeting on August 26, 2024, "Ms. Norman confirmed that [Defendant] would perform under the Agreement."  (*Id.* ¶ 26.)  However, Ms. Norman then failed to respond to multiple follow-up inquiries.  (*Id.* ¶¶ 27-32.)  On October 2, 2024, Mr. Smith reached out to one of Plaintiff's representatives "to discuss the Agreement" (*id.* ¶ 33), and Plaintiff's notes from that call reflect that Plaintiff proposed two options for modifying the terms of the Agreement.  (Doc. 1-3.)  However, Mr. Smith then ignored several follow-up communications from Plaintiff (Doc. 1 ¶¶ 34-36) before writing on October 16, 2024 "that [Defendant] is a start up with no groups that would benefit from the data stream, that they were considering their options, and that the 6,000 lives was a goal, but not likely until sometime in the future."  (*Id.* ¶ 36.)  Afterward, Plaintiff sent another follow-up inquiry but Mr. Smith failed to respond.  (*Id.* ¶ 37.)

Based on those allegations, the complaint asserts two claims for relief: (1) a claim for breach of contract in which Plaintiff seeks damages of $220,500 (*i.e.*, the amount of the three unpaid invoices), plus tax and interest at a monthly rate of 1.5% as specified in the Agreement; and (2) a claim for "anticipatory breach of contract" in which Plaintiff seeks damages of $1,249,500 (*i.e.*, all of the future quarterly payments of $73,500 that would have been owed during the remainder of the five-year term of the Agreement), plus tax and interest.  (*Id.* ¶¶ 41-62.)

On January 13, 2025, Defendant was served with process.  (Doc. 6.)

On February 7, 2025, Plaintiff applied for entry of default.  (Doc. 9.)

On February 10, 2025, the Clerk of Court entered a default.  (Doc. 10.)

On February 26, 2025, Plaintiff filed the pending motion for default judgment.  (Doc. 11.)  Defendant has not responded.

…

**DISCUSSION**

As noted, in Count One of the complaint, Plaintiff asserts a claim for breach of contract. Under Arizona law, "in an action based on breach of contract, the plaintiff has the burden of proving the existence of a contract, breach of the contract, and resulting damages." *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004). In Count Two, Plaintiff asserts a claim for anticipatory breach. Under Arizona law, "[a]nticipatory breach of contract exists where the repudiating party expresses a positive and unequivocal manifestation that he will not render the required performance when it is due." *Oldenburger v. Del E. Webb Development Co.*, 765 P.2d 531, 533 (Ariz. Ct. App. 1988).[1]

In its motion for default judgment, Plaintiff provides the following argument as to why the second and third *Eitel* factors are satisfied here:

> HCIQ and 1850 entered into the Agreement on or about May 9, 2024. Pursuant to the terms of the Agreement, HCIQ agreed to provide the Software and other services to 1850 in exchange for quarterly payments in the amount of $73,500.00 by 1850 over a five-year term. The Agreement is valid, binding, and enforceable, and HCIQ has complied with its obligations under the Agreement. However, 1850 has failed to make *any* quarterly payments as required by the Agreement, including for the Invoices, sent to 1850 by HCIQ on July 1, 2024, October 1, 2024, and January 7, 2025, which total $220,500.00. 1850 has breached the Agreement by failing to pay the Invoices on receipt, thereby damaging HCI. . . . 1850 has [also] made clear to HCIQ that it will continue to breach the Agreement, to HCIQ's detriment, by failing to make any future quarterly payments for the remainder of the five-year term of the Agreement. The Agreement remains in effect and has not been terminated. Thus, HCIQ is entitled to recover damages for 1850's anticipatory breach of the remainder of the five-year term of the Agreement, which amounts to $1,249,500.00 in damages to HCIQ.

(Doc. 11 at 5-6.)

The Court agrees with Plaintiff that the factual allegations in the complaint state a plausible claim for relief as to Count One. The complaint plausibly alleges the existence of a contract, a breach (*i.e.,* Defendant's failure to pay the first three $73,500 invoices), and damages.

---

[1] "[A]n anticipatory breach, by itself, does not entitle the injured party to damages. To recover damages, in addition to proving repudiation, the non-breaching party need only show that he would have been ready and willing to have performed the contract, if the repudiation had not occurred." *Thomas v. Montelucia Villas, LLC*, 302 P.3d 617, 620 (Ariz. 2013).

The analysis is more complicated as to Count Two. As noted, anticipatory breach "exists where the repudiating party expresses a *positive and unequivocal manifestation* that he will not render the required performance when it is due." *Oldenburger*, 765 P.2d at 533 (emphasis added). However, the complaint does not allege that any of Defendant's representatives expressed a positive and unequivocal intention not to comply with Defendant's future payment obligations under the Agreement. To the contrary, the only direct statement on this topic referenced in the complaint is Ms. Norman's statement in August 2024 in which she "confirmed that [Defendant] would perform under the Agreement." (Doc. 1 ¶ 26.) Perhaps Plaintiff's theory is that Defendant's subsequent conduct, which consisted of failing to pay the past-due invoices and ignoring multiple follow-up inquiries, raises an inference that Defendant intended to violate future payment obligations, but Plaintiff has not cited any authority—and the Court is aware of none—holding that an inference arising from silence and inaction qualifies as a "positive and unequivocal manifestation" of intent not to perform. *See also United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 429 (Ariz. Ct. App. 1983) ("A statement by a party to a contract merely implying that he will not perform is not the equivalent of a positive and unequivocal refusal to perform.") (citation omitted); *Diamos v. Hirsch*, 372 P.2d 76, 78-79 (Ariz. 1962) (affirming the trial court's grant of a directed verdict in favor of the defendant, where the plaintiff sought to assert a claim "for breach of contract based upon the anticipatory repudiation by one of the parties to the contract," because the defendant merely "*implied* that he wanted plaintiff to sign the addendum or defendants would not perform" and "never made a positive statement that defendants would not perform unless plaintiff agreed to the addendum" and thus the evidence "f[ell] far short of the requisite proof that in order to constitute a breach by anticipatory repudiation there must be a positive and unequivocal refusal to perform"). For similar reasons, it is not obvious why Mr. Smith's final communication on October 16, 2024 could be deemed sufficient to meet the "positive and unequivocal manifestation" standard—he simply stated that Defendant "would [not] benefit" from Plaintiff's modification proposals and that

Defendant was "considering [its] options." (Doc. 1 ¶ 36.)

Additionally, the Agreement, which is appended to the complaint and is therefore incorporated by reference, specifies that Defendant has the right to terminate the Agreement "at any time following the second (3rd) anniversary of the Effective Date upon ninety (90) days written notice to [Plaintiff]." (Doc. 1-1 at A-8 ¶ 11(a).) The parties' apparent typographical error in specifying that Defendant could terminate after the "second" anniversary but placing "3rd" in parentheses makes this contractual term ambiguous. When written and numerical terms are in conflict, the "general rule" is that "the written number controls." *Fetch Interactive Television LLC v. Touchstream Techs. Inc.*, 2019 WL 193921, *20 (Del. Ch. 2019); *see also id.* at *20 n.235. Further complicating the analysis here, the Agreement incorporates by reference six "Schedules," one of which is "Schedule F – Order Form," and specifies that "[i]n the event of a conflict between the terms of this Agreement and any Order Form, the terms of this Agreement will control." (Doc. 1-1 at A-12 ¶ 17(e).) The Schedule F "Order Form" contains a clause near the bottom of the first page specifying, in bold font, that the "**Term**" is "**3 Years (April 29, 2024, through April 28, 2027)**." (*Id.* at A-34.) To the extent this term designation conflicts with the definition of the "Initial Term" in the Agreement, which is defined as "a period of five (5) years" (*id.* at A-8 ¶ 11(a)), the definition in the Agreement "will control." But to the extent the three-year term specified in Schedule F could shed light on whether Defendant had the right to terminate the Agreement following the "second" or "3rd" anniversary of the effective date, this is a consideration to bear in mind when construing the ambiguous term in the Agreement.[2]

At any rate, however the ambiguous contractual term is construed, Defendant was not obligated to continue payments for the full five-year term. It is therefore difficult to understand how Defendant could be liable for payments beyond the second or third

---

[2] In an October 3, 2024 email from one of Plaintiff's principals to one of Defendant's principals, Plaintiff referred to the Agreement as having a "3-year term" and proposed two "options" for Defendant's consideration—keeping the three-year term or agreeing to a two-year term. (Doc. 1-3 at 3-4.) Defendant neither agreed with nor objected to Plaintiff's characterization of the Agreement's term length.

- 5 -

anniversary of the Agreement's effective date.  An anticipatory breach applies only to a "required performance," *Oldenburger*, 765 P.2d at 533, and Defendant's performance under the Agreement does not appear to be "required" after the point when Defendant is allowed to "terminate" the Agreement "at any time."   (Doc. 1-1 at A-8 ¶ 11(a).)  Put another way, it does not seem plausible that Defendant's obligation to make $73,500 quarterly payments would have extended beyond two or three years, depending on how the ambiguous term in the Agreement is construed (as opposed to the five-year term on which Plaintiff bases its damage calculations in Count Two).

Furthermore, although the record is not developed on this point, it is possible that Plaintiff would have incurred at least some costs in the course of providing the agreed-to software and other services to Defendant pursuant to the Agreement (and that Plaintiff's anticipated quarterly profit was thus the agreed-to payment of $73,500 minus those unspecified costs).  However, once Defendant anticipatorily breached the Agreement, Plaintiff would stop incurring those costs.  Awarding $73,500 in damages to Plaintiff for each future quarter following any anticipatory breach would thus result in a windfall to Plaintiff.  In anticipatory breach cases, courts often require an offset to avoid such a windfall.  *See generally Arens Controls Co., L.L.C. v. Enova Sys., Inc.*, 2012 WL 13066501, *3 (N.D. Ill. 2012) ("Damages for anticipatory breach of contract include: (1) the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages . . . *but less expenses saved in consequence of the buyer's breach* or, if this measure of damages is inadequate to put the seller in as good a position as performance would have done then (2) the profit (including reasonable overhead) which the seller would have made from full performance by the buyer . . . .") (cleaned up) (emphasis added).  Accordingly, assuming Plaintiff is able to remedy the other shortcomings regarding Count Two identified in this order, it must also provide information regarding the costs it would have incurred when performing under the Agreement and whether it would have avoided those costs in the case of an anticipatory breach.

A final potential complication with Plaintiff's damage calculation in Count Two is that Plaintiff makes no effort to account for the time value of money. *See generally Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742, 745-46 (2d Cir. 1988) ("We have previously explained in some detail the proper method of discounting a future income stream to present value. Our approach takes into account two matters—inflation and the opportunity to invest money. Because a dollar received in the future will almost surely have less purchasing power than a dollar has today, we have required estimates of lost future earnings to reflect the effect of inflation. In addition, because a dollar received today may be invested and produce a larger sum of money in the future (even though that sum will have less purchasing power than an equivalent sum has today), we have required that damages for loss of earnings that would have been received in the future must be discounted to reflect the fact that, even if there were no inflation, a dollar received today is worth more than the right to receive a dollar in the future.") (citations omitted). The $73,500 quarterly payments owed over the remaining term of the Agreement (whatever the length of that remaining term) would not be payable right now—instead, they would be payable over time. In analogous situations, courts have required the plaintiff pursuing an anticipatory breach claim to discount the value of the future payments to their present value. *Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minnesota, LLC*, 2014 WL 12597430, *17 (D. Minn. 2014) ("[T]he general rule is that anticipatory repudiation of a contract permits the aggrieved party to sue for damages resulting from future as well as past non-performance. Awards of future damages generally require adjustment, or discounting, to present value by the application of a discount rate. The discount rate performs two functions: (i) it accounts for the time value of money; and (ii) it adjusts the value of the cash flow stream to account for risk.") (cleaned up); *Long Island R. Co. v. Northville Industries Corp.*, 362 N.E.2d 558, 566 (N.Y. Ct. App. 1977) (upholding award of damages for anticipatory breach but clarifying that "[t]his does not mean, however, that the railroad is presently entitled to the full $20,000 guaranteed minimum for those annual payments not yet due" because "[s]ince these amounts will be collected in advance of their due date,

- 7 -

the respective installments should be discounted to their present value"). However, Plaintiff has not performed any such discounting here.

The Court will authorize Plaintiff to submit supplemental briefing on these issues. Alternatively, Plaintiff may withdraw the portion of the default judgment motion based on Count Two.

Accordingly,

**IT IS ORDERED** that within 14 days of the issuance of this order, Plaintiff must either file (1) a supplemental memorandum addressing the perceived deficiencies in Count Two identified above; or (2) a memorandum confirming that Plaintiff does not wish to further pursue Count Two and would be satisfied with the entry of a default judgment in its favor on Count One.

Dated this 21st day of April, 2025.

Dominic W. Lanza
United States District Judge